**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAULA NGUYEN,                          )
                                       )
                    Plaintiff,         )          2:07-cv-751
        v.                             )
                                       )
MICAHEL J. ASTRUE,                     )
COMMISSIONER OF SOCIAL SECURITY,       )
                                       )
                    Defendant.         )


**MEMORANDUM OPINION AND ORDER OF COURT**

I.     **Introduction**

        Pending now before the court are cross-motions for summary judgment based on the

administrative record: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No.

5) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 6).  The

motions have been fully briefed and are ripe for resolution.

        Plaintiff, Paula Nguyen, (hereinafter "Plaintiff") brought this action pursuant to 42 U.S.C.

§ 405(g) to seek review of the final determination of the Commissioner of Social Security

(hereinafter "Commissioner") which denied her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.


II.    **Background**[1]

────────────────────

        [1]Defendant filed the Transcript of the Administrative Proceeding in eight parts
(Document No. 3, part 1, 55 pages in total; Document No. 3-2, part 2, 55 pages in total;
Document No. 3-3, part 3, 55 pages in total; Document No. 3-4, part 4, 55 pages in total;
Document No. 3-5, part 5, 55 pages in total; Document No. 3-6, part 6, 55 pages in total;

A. **Facts**

Plaintiff was born on February 16, 1960 and was within the age range of 41 to 43 years during the period at issue, March 30, 2001 to September 30, 2003. She is considered to be a "younger individual" as defined in 20 C.F.R. § 404.1563. Plaintiff's work history includes employment as a jewelry/sales clerk (classified as semi-skilled at the light level), a waitress (classified as unskilled at the medium level), and a child care provider (classified as unskilled at the medium level). R. 3, at 26.

Plaintiff alleges disability, as of March 30, 2001, due to rheumatoid arthritis and allergies to such things as perfumes and other chemicals. R. 3, at 17. Plaintiff claims that she suffers from joint warmth, joint deformity, impaired appetite, tenderness, reduced grip, crepitus, and significant limitations in reaching, handling, and fingering. Pl. Br., at 1.

Plaintiff began seeing her first primary care physician, Dr. Joseph Richetti (hereinafter "Richetti"), on January 24, 2001 and presented for evaluation using a 4-legged cane. R. 41. Richetti noted that Plaintiff's left leg was swollen to twice the size of the right leg although the right leg caused Plaintiff more pain. *Id.* Plaintiff had difficulty straightening her knees. *Id.* Richetti also observed that Plaintiff had lost 50 pounds and did not have much of an appetite. *Id.* Richetti diagnosed Plaintiff with left lower extremity edema and severe unintentional weight loss. *Id.* Richetti gave Plaintiff only two week's supply of Vioxx for her knee pain as Plaintiff did not have insurance. *Id.* Plaintiff again saw Richetti on February 27, 2001 and he noted that

---

Document No. 3-7, part 7, 55 pages in total; and Document No. 3-8, part 8, 22 pages in total. The Court will cite to the Transcript by listing the document number and the page (an example being, R. 3-3, at 1, which refers to the Transcript, Document No. 3-3, at page 1).

Plaintiff continued to experience swelling in her left lower extremity and pain in her knees, hands, and elbows.  R. 3, at 40.  She had difficulty holding items with her hands.  *Id.*  She was taken off Vioxx as it caused her hives.  *Id.*  Results from her blood studies reflected a positive rheumatoid factor which was an indication of possible rheumatoid arthritis.  *Id.*  Richetti also saw Plaintiff a year later on June 12, 2002 and he observed that Plaintiff was stable and doing well.  R. 3-3, at 36.

Richetti had referred Plaintiff to McAuley Rheumatology Associates, Inc. ("MRA") where she was examined by Dr. Wendy Stiles (hereinafter "Stiles") on March 20, 2001.  Stiles noted that Plaintiff does have a history of rheumatoid arthritis as it was diagnosed in her wrists and shoulders when she was in her 20's.  R. 3-3, at 38.  Plaintiff stated that the rheumatoid arthritis was in remission and did not reappear until early 2000.  *Id.*  Stiles observed that Plaintiff's joints were warm and swollen, especially her knees.  R. 3-3, at 39.  Plaintiff's shoulder strength was greatly reduced and her joint range of motion was limited.  *Id.*  There was a trace of edema in the left lower extremity.  *Id.*  Stiles diagnosed Plaintiff with a high probability of having rheumatoid arthritis due to her a-positive rheumatoid factor at 1:16.  *Id.*  Stiles recommended that Plaintiff get physical and occupational therapy and have Cortisone injections in her knees bilaterally if the Prednisone did not quell the inflammation.  *Id.*

On April 25, 2001, Plaintiff met with another MRA physician, Dr. Catherine Cunningham (hereinafter "Cunningham") who noted that Plaintiff's regimen of Methotrexate 7.5 mg and Prednisone 5mg was helping.  R. 3-4, at 25.  Plaintiff had much less pain and a fairly good range of motion (able to move and squeeze), although she did still have some synovitis.  *Id.*  Cunningham recommended that Plaintiff continue with Methotrexate, Folic Acid, Calcium, and

Prednisone (despite Plaintiff's reluctance to use it).  *Id.*

On June 13, 2001, Plaintiff saw a third MRA physician, Dr. David Helfrich (hereinafter "Helfrich") who continued as Plaintiff's long-term care MRA rheumatologist.  R. 3-4, at 22. Helfrich noted that Plaintiff had "clear-cut improvement" in her synovitis (although it was still active at some of her PIP joints) and continued to take Methotrexate 7.5mg, Prednisone 2.5 mg, Folic Acid 1 mg and Calcium.  *Id.*   He also observed that Plaintiff still experienced morning stiffness, puffy wrists, warm knees (the right more so than the left), some pain and swelling, and a gelling phenomenon.  *Id.*   He increased Plaintiff's Methotrexate dosage to 15 mg while maintaining the other medications at the same level.  *Id.*

Helfrich saw Plaintiff for a follow-up on August 22, 2001.  R. 3-4, at 14.  Plaintiff's synovitis had improved considerably with the increase in the Methotrexate dosage.  *Id.*  Her wrists were less puffy, her elbows were extending well, her ankle and subtalar joints were doing well, and her shoulders, hips, and knees were quiet.  *Id.*  Helfrich noted a "marked improvement" in Plaintiff's rheumatoid arthritis and recommended that Plaintiff stay with the same regimen. *Id.*   Helfrich also met with Plaintiff on May 22, 2002.  R. 3-4, at 53.  Plaintiff continued to do well with the Methotrexate at 15 mg, Ibuprofen at 800 mg and the Folic Acid at 1 mg.  *Id.* Plaintiff had also gained weight and Helfrich recommended that she control her weight and exercise.  *Id.*  Plaintiff had a minimal degree of synovitis, the swelling had been reduced greatly and her wrists, elbows, and shoulders were quiet.  *Id.*  She still experienced some tenderness in her left ankle.  *Id.*

On January 15, 2003, Helfrich declared Plaintiff's rheumatoid arthritis to be in remission. R. 3-5, at 39.  Plaintiff continued with Methotrexate 15 mg, Ibuprofen 800 mg, and Folic Acid 1

mg.  *Id.*  Plaintiff no longer experienced warmth in her joints and she had a full range of motion

in her shoulders, wrists, knees, hips, elbows, and ankles and a good hand grasp.  *Id.*  Plaintiff did

have positive crepitus and minimal warmth to her knees bilaterally.  *Id.*  Her condition continued

to remain stable as confirmed by her visitations with Helfrich on July 23, 2003 and April 24,

2004.  R. 3-5, at 30 and 32.

   Plaintiff's visit with Helfrich on October 20, 2004 evidenced continued progress along

with some areas of noticeable regression.  Plaintiff complained of sharp and stabbing knee pain

and hip pain.  R. 3-5, at 23.  She had crepitus in her right and left knees and the morning stiffness

in her hands appeared to last all day.  *Id.*  However, Plaintiff continued to have a full range of

motion in her elbows, wrists, and shoulders.  *Id.*  Helfrich noted the possibility of Plaintiff's

rheumatoid arthritis flaring up again.  *Id.*

   During Plaintiff's visit on February 9, 2005, Helfrich noted that Plaintiff was still

experiencing day-long stiffness along with arthralgia in her hands, knees, feet, and shoulders.  R.

3-5, at 55.  Physical examination revealed tenderness at her PIP joints and hamstrings, her wrists

were tender at the ulnar aspects, she had patellofemoral knee pain although her elbows had good

extension and her shoulder motion was not restricted.  *Id.*  Helfrich recommended that Plaintiff

start taking Etanercept (Enbrel) as an alternative to the Methotrexate but decided to wait before

prescribing it as Plaintiff did not have insurance.  *Id.*  Helfrich's final diagnosis was that

Plaintiff's rheumatoid arthritis had returned.  *Id.*

   During subsequent visits on May 4, 2005, June 29, 2005, and September 21, 2005,

Helfrich observed that Plaintiff's rheumatoid arthritis had become active with joint discomfort in

her hands and knees.  R. 3-5, at 52-54.  She still had tenderness at her PIP joints along with

swelling, erythema, and warmth.  *Id.*  She continued to have good motion in her elbows, shoulders, and hips although the degree of crepitus in her joints had risen.  R. 3-5, at 52.  Plaintiff was able, however, to obtain samples of Enbrel and commence treatment.  *Id.*  Her Enbrel regimen was curtailed however as Plaintiff attributed her jaundiced condition to the medication.  *Id*.

During the period of late 2005 and early 2006, Plaintiff saw Dr. Charles Calabrese (hereinafter "Calabrese") and Dr. Sarah Goodlive (hereinafter "Goodlive") for treatment of gastritis, cholestasis, colon polyps, and mild hepatitic changes attributable to Hepatitis B.  R. 3-6, at 49-55; R. 3-7, at16-41.  Plaintiff also underwent a series of biopsies, stent placement, an ERCP surgery with biliary stone extraction, and a colonoscopy for polyp formations.  R. 3-6, at 37-49.  Plaintiff saw Helfrich on January 18 and April 24, 2006 who noted that Plaintiff's jaundice had been resolved and concluded that her hepatitis was not due to the use of Methotrexate or Etanercept but stone disease.  R. 3-7, at 14-15.  Plaintiff was taken off both medications pending a liver biopsy.  *Id.*  While lacking full extension in her right knee, Plaintiff continued to enjoy good motion in her elbows, shoulders, and knees.  *Id.*  She was still taking 800 mg of Ibuprofen twice a day but that did little to alleviate the pain.  *Id.*  Helfrich observed that Plaintiff had positive synovitis, tenderness in the shoulders, positive edema, and positive joint line tenderness.  *Id.*

There were a series of residual functional capacity assessments made of Plaintiff's condition.  A state medical consultant ("consultant") conducted the first residual functional

capacity (RFC) on April 3, 2003.[2]  R. 3-5, at 14-21.  The consultant noted that Plaintiff can occasionally lift/carry no more than 10 pounds, frequently lift/carry less than 10 pounds, stand/walk at least 2 hours in an 8-hour work day, sit for a total of about 6 hours in an 8-hour work day, and push/pull for an unlimited amount of time.  *Id.*  The consultant also stated that Plaintiff could only occasionally climb, kneel, stoop, crouch, and crawl.  *Id.*  There were no environmental limitations.  *Id.*

A second RFC was conducted by Dr. D.S. Kar (hereinafter "Kar"), a state agency medical expert, on March 8, 2005.  R. 3-5, at 41-48.  Kar had made a determination of Plaintiff's capabilities prior to October 2003.  Kar noted that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, sit and stand/walk for about 6 hours in an 8-hour work day with no limitations on pushing or pulling.  *Id.*  Kar did not observe any postural, manipulative, or environmental limitations.  *Id.*  Kar noted that Plaintiff was not doing any physical therapy, had no trouble operating the remote control, was able to drive, and functioned independently with some help from her husband.  *Id.*

Helfrich conducted a RFC on December 12, 2005 and gave a prognosis of the Plaintiff's rheumatoid arthritis being good with the use of medication.  R. 3-6, at 6.  He stated that she had joint warmth and deformity, impaired appetite, tenderness, and crepitus.  R. 3-6, at 7.  He also noted that it was seldom that her pain was severe enough to interfere with attention and concentration.  *Id.*  Plaintiff's impairments were reasonably consistent with her symptoms and she was able to tolerate a moderate amount of stress.  R. 3-6, at 8.  She could only sit for one

---

[2]The Court notes that the name of the state medical consultant on the RFC and the majority of his assessment is illegible and there are no other references to the medical consultant's name elsewhere on the record.

hour at a time, stand for 30 minutes, stand/walk for less than 2 hours in an 8-hour work day, sit

for about 4 hours in a work day, and could not walk more than a block. R. 3-6, at 8-9. He also

observed that Plaintiff would need to take unscheduled breaks during a work day (every 2 to 3

hours) and rest 5 to 10 minutes. R. 3-6, at 9-10. He listed her as having significant limitations in

repetitive reaching, handling, and fingering, indicated that she could only use her hands, fingers,

and arms 20% of a workday, and stated that Plaintiff would have to be absent from work 2 days

each month. R. 3-6, at 11.

Goodlive conducted a RFC assessment on January 5, 2006 and characterized Plaintiff's

hand stiffness as severe and attributed the swelling to rheumatoid arthritis. R. 3-6, at 27-28. She

stated that Plaintiff could lift no more than ten pounds occasionally and could only do no more

than two hours of sitting and standing/walking. *Id.*

On February 1, 2006, Dr. Richard Hahn (hereinafter "Hahn"), a state agency consultative

examiner, met with Plaintiff. R. 3-6, at 29-36. Plaintiff presented with soreness and morning

stiffness. Hahn stated that Plaintiff had stopped using the Methotrexate and Enbrel in July 2005.

*Id.* Her grip strength was at about 20% with multiple areas of inflammation. *Id.* Hahn noted

that while Plaintiff was tender and had swollen wrists and knees, this did not affect her range of

motion. *Id.* Hahn concluded that Plaintiff's impairments impeded such capabilities as

lifting/carrying, standing/walking (2 hours in an 8-hour workday), sitting (frequent adjustment),

handling, pushing/pulling, and reaching. *Id.* Hahn also observed that Plaintiff cannot climb,

stoop, balance, kneel, crouch, or crawl and would be limited to areas with no moving machinery,

extreme temperatures, dust, humidity, or heights. *Id.*

## B.     Procedural History

Plaintiff filed an application for DIB on February 25, 2003 which was denied on April 10,

2003 but Plaintiff did not appeal the decision.  Plaintiff reapplied on December 28, 2004, and

again alleged disability due to rheumatoid arthritis and allergies, beginning in March 30, 2001.

Plaintiff's claim was denied on March 9, 2005.  Plaintiff timely requested a hearing on March 22,

2005.  The hearing was held before Administrative Law Judge Karl Alexander ("ALJ") on June

8, 2006, at which Plaintiff, represented by counsel, testified along with Vocational Expert, John

M. Panza.  On August 23, 2006, the ALJ denied Plaintiff's claim under the five-step sequential

analysis used to determine disability and found that Plaintiff was not disabled from the alleged

onset date of March 30, 2001 through September 30, 2003.  The ALJ dealt with two issues before

moving on to the determination on Plaintiff's disability.  The first issue was whether the initial

unfavorable decision (the February 25, 2003 application and the April 10, 2003 denial) should be

reopened and revised and, in turn, be applied to the determination of Plaintiff's then-current

December 28, 2004 application for DIB.  The ALJ determined that since Plaintiff had filed an

application for DIB within four years of the April 10, 2003 decision, that decision should be

reopened and revised for good cause, pursuant to 20 C.F.R. 404.987 *et seq*.  The second issue

was whether Plaintiff's earnings of record were sufficient to establish coverage for a Period of

Disability and DIB as required under Section 216(I) of the Social Security Act.  The ALJ decided

that Plaintiff's earnings were sufficient to establish coverage only through September 30, 2003

and the determination of her benefits would be conditioned on her ability to establish a

"disability" prior to September 30, 2003.

At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful

activity since having alleging disability on March 30, 2001.    The ALJ determined at step two that, during the "initial period at issue," Plaintiff was significantly limited in her ability to perform work activities, for a period of at least 12 consecutive months, by a medically determinable severe impairment stemming from rheumatoid arthritis.  However, at step three, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the "listed impairments" set forth in 20 C.F.R. 404 Subpart P, App. 1, Regulation No. 4 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  At step four, the ALJ found that Plaintiff retained the residual functional capacity to perform work at the light level of physical exertion without the climbing of ladders, ropes or scaffolds or exposure to extreme temperatures and with the option to sit/stand and occasionally engage in other postural movements.  At step five, the ALJ concluded that the government had met its burden to show that Plaintiff had the residual functional capacity to perform other work that exists in the national economy and that the Plaintiff was not disabled during the time period from March 30, 2001 through September 30, 2003, pursuant to the Social Security Act.

Plaintiff requested a review of the ALJ's decision.  The Appeals Council affirmed the ALJ's decision which became the final decision of the Commissioner.  Plaintiff then filed the instant complaint to seek judicial review of the Commissioner's decision.

### III.    Legal Analysis

#### A.    Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g).  If the Commissioner's finding is supported by substantial evidence, it is

conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g);  *Schaudeck v. Comm'n of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).   The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  It consists of more than a scintilla of evidence, but less than a preponderance.  *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation.  20 C.F.R. §§ 404.1520 and 416.920 (1995).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work.  *See* 42 U.S.C . § 404.1520; *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period."  *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987);  42 U.S.C. § 423 (d)(1) (1982).
This may be done in two ways:

> (1)  by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P., Appendix 1.  *See Heckler*

> *v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,
>
> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

When a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner, nevertheless, must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")

It is well established that state agency consultants are considered to be "highly qualified

physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 404.1527 (f)(2)(I). However, the opinions of state agency consultants constitute substantial evidence in support of the ALJ's findings provided they are supported by substantial record evidence. It is well established that a medical opinion will not be given controlling weight when it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2).

### B. Discussion

As set forth in the Act and applicable case law, this Court may not undertake a *de novo* review of the decision of the Commissioner or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

Plaintiff argues that the ALJ erred, as a matter of law, when he failed to accord controlling weight to the opinion of Plaintiff's treating physician, Dr. Helfrich. She also contends that the ALJ erred by not finding Plaintiff to be fully credible with regard to her

testimony of subjective pain and by having concluded that Plaintiff did not meet the requirements

for Listing 14.09A for rheumatoid arthritis.  Plaintiff's final argument is that the ALJ erred by

failing to recognize Plaintiff's limitations for grip and dexterity in his residual functional capacity

assessment.

The Commissioner asserts that the decision of the ALJ should be affirmed as it is

supported by substantial evidence of record.  The Commissioner argues that the ALJ properly

found that Plaintiff did not have an impairment that met or equaled a listed impairment and that

Plaintiff retained the RFC to perform light work with additional limitations.

> 1.     *The ALJ correctly concluded that Plaintiff did not have any medically
>         determinable impairments that met or equaled the criteria of a Listed Impairment.*

Plaintiff contends that the ALJ erred in his finding that Plaintiff did not meet the

requirements of Listing 14.09A for rheumatoid arthritis.  The Commissioner argues that the

evidence of record did not reveal any of the symptoms required to meet the criteria of Listing

14.09A.  Disability under Listing 14.09A is established by showing:

> a history of joint pain, swelling, and tenderness, and signs on current physical
> examination of joint inflammation or deformity in two or more major joints
> resulting in inability to ambulate effectively or inability to perform fine and
> gross movements effectively.  The limitation must have lasted, or be expected
> to last, for at least 12 months.

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 14.09A.

> The major joints are referred to as:
> the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to other
> peripheral joints (e.g., the joints of the hand or forefoot) or axial joints (i.e., the
> joints of the spine.)  The wrist and hand are considered together as one major
> joint, as are the ankle and foot.

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 14.00B6b.

The Supreme Court elaborated explicitly on the meaning of matching or equaling a listed impairment. In *Sullivan v. Zebley*, the Supreme Court stated that, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. 493 U.S. 521, 531-532 (1990) (emphasis in original). *See also Petition of Sullivan*, 904 F.2d 826, 839 (3d Cir. 1990).

Initially, the ALJ sought to resolve the issue of whether an earlier unfavorable decision which denied Plaintiff benefits (resulting from Plaintiff's first application for disability on February 25, 2003) should be reopened and revisited in the determination of Plaintiff's current re-application for benefits. The ALJ concluded that there was good cause to reopen and revisit the previous determination for two reasons; namely due to the fact that Plaintiff's first application for benefits (February 25, 2003) fell within four years of April 10, 2003 (the date Plaintiff's first application was denied) and the alleged onset date of disability for both applications for benefits was March 30, 2001. R. 3, at 17. The ALJ also examined Plaintiff's insured status in relation to Plaintiff's earnings of record and the period of coverage for DIB. The ALJ found that Plaintiff's earnings of record were enough to establish coverage through September 30, 2003. R. 3, at 18. Accordingly, the ALJ concluded that Plaintiff's application would be examined to determine whether Plaintiff was disabled between the period of March 30, 2001 and September 30, 2003. It is within this "initial period at issue" and the corresponding evidence of record, that the ALJ made his determination of Plaintiff's application for benefits.

Plaintiff argues that the symptoms described in Listing 14.09A are supported by record

evidence. She states that she does have joint pain, joint swelling, and joint tenderness. She also has ongoing joint inflammation in at least two of her major joints including her shoulders, knees, and wrists which has led to severe hand-gripping problems. The Commissioner argues that Plaintiff has not met the criteria established in Listing 14.09A as the facts and evidence relevant to the "initial period at issue" did not reveal any symptoms corresponding to Listing 14.09A criteria. Rather, the evidence shows that Plaintiff's condition was stable at this period in time.

The Court agrees with the Commissioner and notes that at no point during Plaintiff's arguments does she discuss or address the fact that the ALJ's determination of her application was based on the evidence of record during the relevant period at issue, i.e. March 30, 2001 and September 30, 2003.[3] Indeed, what is evident from the record is that although Plaintiff suffered from symptoms indicative of rheumatoid arthritis, the symptoms did not last for at least twelve consecutive months and were controlled during the relevant period at issue.

The ALJ reviewed the evidence of record during the "initial period at issue." He examined Plaintiff's statements regarding her capabilities. On January 24, 2001, Plaintiff had attested to using a four-legged cane and occasionally, a single cane, even though she did not have any upper extremity pains or weakness in her joints. R. 3, at 22. Plaintiff had also indicated that

_____

[3]The ALJ also made the same observation when discussing Plaintiff's pre-hearing memorandum that was submitted in December 2005. He stated, "[t]he claimant asserted that she had 'joint warmth,' 'joint deformity,' 'reduced grip,' 'tenderness' and 'crepitus,' and indicated 'significant limitations' as to 'performing repetitive reaching, handling and fingering' . . . The claimant in her December 2005 memorandum does not specifically assert that all of the limitations alleged were present during the 'initial period at issue' herein, i.e., prior to October 1, 2003." R. 3, at 22.

she was not taking any medications and had not seen any doctors.  *Id.*  The ALJ found that the occasional use of a single cane was not enough to establish the Listing requirement of the inability to ambulate effectively.  *Id.*  Plaintiff also stated on March 20, 2003, that she was able to drive a car, shower and dress herself, push a lightweight vacuum, go up 13 stairs, use a knife and fork, grocery shop and load/unload lightweight bags, pay bills (although with eventual hand cramping), tie her shoes, user a walker cane as needed, and use a touch-tone telephone.  *Id.*, R. 3-2, at 30-33.

The ALJ noted Plaintiff continuous improvement in her rheumatoid arthritis in 2001, 2002, and 2003.  Plaintiff was first diagnosed with rheumatoid arthritis on March 20, 2001 by Dr. Stiles.  Stiles observed that Plaintiff had warm joints, swollen knees, reduced strength in her shoulder, and limited range of motion in her joints.  R. 3-3, at 39.  Stiles recommended that Plaintiff get Cortisone injections for the inflammation along with physical and occupational therapy.  *Id.*  Plaintiff saw Dr. Cunningham about a month later who noted that Plaintiff's use of Methotrexate and Prednisone was helping to improve her condition.  R. 3-4, at 25.  Plaintiff exhibited a fairly good range of motion and experienced less pain.  *Id.*  On June 13, 2001, Plaintiff saw Dr. Helfrich who observed "clear-cut improvement."  R. 3-4, at 22.  She was still experiencing morning stiffness and warm and puffy knees.  *Id.*  Helfrich saw Plaintiff on August 22, 2001 and again noted "marked improvement" in Plaintiff's rheumatoid arthritis; Plaintiff's elbows were extending well, her wrists were less puffy, her knees were quiet and her subtalar joints were doing well.  R. 3-4, at 14.  On May 22, 2002, Helfrich observed the continued improvement of Plaintiff's condition as she had a minimal degree of synovitis, her wrists,

elbows, and shoulders were quiet, and the swelling had gone down. R. 3-4, at 53. Plaintiff saw

Dr. Richetti on June 12, 2002 who wrote that Plaintiff was "doing quite well" and was in "no

acute distress". R. 3-3, at 36. Indeed, Plaintiff's improvement was so significant that Helfrich

diagnosed Plaintiff's rheumatoid arthritis as being remitted on January 15, 2003. R. 3-5, at 39.

The ALJ concluded that the record shows no evidence of Plaintiff suffering from extreme

impairment-related limitations for twelve consecutive months during the "initial period at issue."

Therefore, the Court finds that there was substantial evidence in support of the ALJ's conclusion

and that Plaintiff did not have any medically determinable impairments that met or equaled the

criteria of a Listed Impairment.


      2.     *The ALJ's adverse credibility determination was not improper.*

Plaintiff asserts that the ALJ failed to give full consideration to her subjective complaints

of pain. Pain, however, is not conclusive evidence of disability. There must also be "medical

signs and findings, established by medically acceptable clinical or laboratory diagnostic

techniques, which show the existence of a medical impairment that results from anatomical,

physiological, or psychological abnormalities which could reasonably be expected to produce the

pain or other symptoms alleged and which, when considered with all [the] evidence . . . would

lead to a conclusion that the individual is under a disability." *Chrupcala v. Heckler*, 829 F.2d

1269, 1275 (3d Cir. 1987). *See also* 20 C.F.R. § 404.1529. Even when subjective complaints of

pain are not fully supported by medical evidence, an ALJ must still consider such complaints

seriously. *Welch v. Heckler*, 80 F.2d 264, 270 (3d Cir. 1986). *See also Bailey v. Apfel*, 1998 WL

401629, at *6 (E.D.Pa. 1998) (internal citations omitted). Furthermore, an ALJ is permitted to determine that a claimant's testimony regarding his or her impairments is less than credible if there are inconsistencies in the claimant's testimony or daily activities. *Burns v. Barnhart*, 312 F.3d 113, 129-30 (3d Cir. 2002).

During the hearing, Plaintiff testified that she suffered from pain and stiffness everyday and had to rest several times during the day. R. 3-7, at 53. She stated that her knees, hands, wrists, shoulders, feet, ankles, hips, neck, and elbows were affected. R. 3-7, at 54. She is constantly dropping things and has a difficult time picking up items. R. 3-8, at 1. The pain affects her sleeping patterns; she is able to sleep throughout the night on some days. R. 3-8, at 7-8. Plaintiff stated that she could only stand or sit twenty to thirty minutes before having to sit down. R. 3-8, at 13. She estimated that she could carry about seven to eight pounds. R. 3-8, at 14. On good days, she can walk as far as two blocks, on bad days she can only walk about half a block. *Id.*

The ALJ considered Plaintiff's statements regarding her pain and the record evidence and found there was no objective medical evidence during the "initial period at issue" to support her complaints of pain. Indeed, the ALJ found that most of Plaintiff's hearing testimony dealt primarily with her then-recent symptoms. R. 3, at 24. There was little to no description of the actual symptoms and limitations as they existed prior to October 2003, during the "initial period at issue." The ALJ acknowledged the short period of time during the "initial period at issue," within which Plaintiff's condition did worsen but he concluded that there was not sufficient medical evidence to show that these symptoms led to a disabling impairment that lasted at least

twelve consecutive months.  *Id.*

The ALJ also examined Plaintiff's ambulatory abilities, as evidenced in the record and as

dictated by Listing 1.00B2c which states:

> Inability to perform fine and gross movements effectively means an extreme
> loss of function of both upper extremities; i.e., an impairment(s) that interferes
> very seriously with the individual's ability to independently initiate, sustain, or
> complete activities. To use their upper extremities effectively, individuals must
> be capable of sustaining such functions as reaching, pushing, pulling, grasping,
> and fingering to be able to carry out activities of daily living. Therefore,
> examples of inability to perform fine and gross movements effectively include,
> but are not limited to, the inability to prepare a simple meal and feed oneself,
> the inability to take care of personal hygiene, the inability to sort and handle
> papers or files, and the inability to place files in a file cabinet at or above waist
> level.

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 1.00B2c (as cited in Listing 14.09A for the meaning of the
terms "inability to ambulate effectively" and  "inability to perform fine and gross movements
effectively" that have lasted at least twelve consecutive months).

The ALJ noted that the evidence does not reflect any indication of Plaintiff having extreme

impairment-related limitations for any twelve consecutive months during the "initial period at

issue."  R. 3, at 22.  He referred to the fact that Plaintiff was able to complete her own written

application with a significant amount of detail which "tends to contraindicate any listing-level

inability to perform fine or gross movements effectively with her wrist/hand."[4]  *Id.*  The ALJ also

---

[4]It appears to the Court that Plaintiff is arguing against the ALJ's adverse credibility
determination as the majority of Plaintiff's argument regarding her complaint of pain is
conducted in this same vein.  The Court notes, however, a portion of Plaintiff's argument in
which she appears to agree with the ALJ and confirm his conclusion by stating, "Just because
Mrs. Nguyen was able to finish the onerous paperwork process for filing her application for
Social Security does not mean she ***has*** severe limitations in her ability to use her hands and
fingers."  Pl. Br., at 11. (Emphasis added.)  As this statement runs contrary to Plaintiff's
argument that she does suffer from severe limitations, the Court will construe it as a "typo," and
that Plaintiff intended to argue that finishing the paperwork does not mean that Plaintiff "does

noted Plaintiff's statements about her daily activities, that she was able to drive a car, pay the bills, shower and dress herself, push a lightweight vacuum, use a touch-tone phone, tie her shoes, use a knife and fork, go grocery shopping, climb up thirteen stairs and load/unload lightweight bags.  *Id.*  The ALJ alluded to the fact that Plaintiff first sought out disability benefits in February 2003 and upon denial, applied again more than one year after the date in which she was last insured for benefits.  R. 3, at 23.  He once again pointed to Plaintiff's continued improvement in her rheumatoid arthritis symptoms as discussed above and concluded that the evidence showed that during the "initial period at issue," "her initially severe symptoms responded rapidly to treatment, progressively diminished and stabilized."  *Id.*  Accordingly, the Court finds that the ALJ did not err in his credibility determination, properly discounted Plaintiff's testimony as most of the symptoms attested to did not occur during the "initial period at issue," and fairly concluded that the evidence did not support extreme-impairment limitations lasting more than twelve consecutive months.

3.      *The ALJ correctly concluded that the treating source's opinion did not deserve controlling weight as it was not supported by substantial evidence.*

Plaintiff argues that the ALJ erred by not according controlling weight to Plaintiff's rheumatologist, Dr. Helfrich.  The Commissioner does not address this issue.  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a

_____

not have" severe limitations.

continuing observation of the patient's condition over a prolonged period of time.' *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)) . . . ." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). The ALJ "cannot reject evidence for no reason or for the wrong reason" but must weigh conflicting medical evidence and can choose whom to credit. *Id.* at 317, *quoting Plummer*, 186 F.3d at 429 (additional citations omitted). *See also Morales*, 225 F.3d at 317-318 (citations omitted), *Fargnoli v. Massanari*, 247 F.3d 34, 42-43 (3d Cir. 2000) (although ALJ may weigh conflicting medical and other evidence, he must give some indication of the evidence he rejects and explain the reasons for discounting the evidence). *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000) (although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence). It is also well established that state agency consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527 (f)(2)(I). Their opinions are given substantial or controlling weight so long as their findings are supported by substantial evidence in the record. SSR 96-6p.

In this matter, Plaintiff, once again, fails to provide evidence relevant to the "initial period at issue." Plaintiff cites to the medical opinions of Helfrich of October 24, 2005 and December 12, 2005, stating that his opinions establish that Plaintiff has met the requirements of Listing 14.09A and that she cannot work. Pl. Br., at 16. The ALJ reviewed the testimony and records and found that state agency consultant, Dr. Kar's March 2005 assessment was supported by the record evidence. Kar had concluded in his report that Plaintiff, prior to October 2003 (during the

"initial period at issue") was capable of light exertional work activity. This is corroborated by Helfrich's own findings during the "initial period at issue" in which he found that Plaintiff's condition evidenced a "clear-cut improvement" in her synovitis in June 2001 with her ankle and subtalar "moving well." R. 3, at 25. Helfrich, once again, noted an improvement in her synovitis in August 2001, due to Plaintiff's increased dosage of Methotrexate. *Id.* Plaintiff's rheumatoid arthritic condition was deemed to have markedly improved by Helfrich. *Id.* and R. 3-4, at 14. Again, in February 20 and May 22, 2002, Helfrich made notations of Plaintiff doing "great," "fine," and "stable," so much so that by January 15, 2003, Plaintiff's rheumatoid arthritis was in remission. R. 3, at 25. The ALJ pointed to the fact that Plaintiff applied for disability benefits the following month in February 2003, an act that runs contrary to Plaintiff's previous diagnoses. Furthermore, Plaintiff's improved and stable condition remained the same when she saw Helfrich in July 23, 2003 when Helfrich observed that Plaintiff was " 'doing fine' with 'no significant flare-ups of disease activity'." *Id.* Plaintiff had good grip strength, her elbows were quiet, she had a good range of motion in her neck, shoulders, and wrists, and there were no ankle or subtalar restrictions. *Id.* The ALJ also noted that Plaintiff's July 23, 2003 visitation was the last evidence of treatment for her symptoms before September 30, 2003, the date on which she was last insured for disability benefits. *Id.* Therefore, the Court concludes that the ALJ properly adduced that Dr. Helfrich's later medical opinion in 2005 did not deserve controlling weight as it was not supported by substantial evidence of Plaintiff's condition during the relevant time period.

4.      *The ALJ correctly assessed Plaintiff's Residual Functional Capacity.*

Plaintiff asserts that the ALJ erred in not finding that she, as a result of joint pain, has residual problems with the use of her hands. The Commissioner contends that the ALJ "more than accommodated any limitations Plaintiff may have had by finding that she could not perform more than light work, with additional limitations." Def. Br., at 10. As discussed earlier, the ALJ accorded great weight to Dr. Kar's March 2005 assessment of Plaintiff's condition prior to October 2003 and determined that Plaintiff could perform light exertional work with a sit/stand option, the absence of climbing ladders, ropes, and scaffolds and exposure to extreme temperatures, and occasional postural movements. R. 3-5, at 41-48 and R. 3-8, at 18. The ALJ posed a hypothetical question to the vocational expert and inquired into whether a person of Plaintiff's age, education, and work experience with the limitations described above would be able to work in a profession in the regional or national economy that allowed for such limitations. R. 3-8, at 18. The vocational expert testified that there are jobs in the existence that fall within the unskilled and light level. *Id.* Such jobs would include that of a mail clerk (not a postal clerk). *Id.* The vocational expert stated that there were 222,000 jobs in the national economy of which at least 2,000 jobs were in the states of West Virginia and Pennsylvania. *Id.* and R. 3-8, at 19. He also stated that there were 260,000 jobs available in the national economy for the job of a hotel/motel clerk at the light, semi-skilled level. *Id.* Of these 260,000 jobs, 4,000 were available in the state of Pennsylvania. *Id.* For a position of housekeeping which was at the unskilled, light level, there was one and a half million jobs in the national economy of which at least 25,000 jobs were in the state of Pennsylvania. The ALJ further queried the vocational expert as to the

numbers of jobs which would be present if the exertional level was reduced to sedentary. The vocational expert testified that the jobs available at the sedentary level include that of a surveillance system monitor operator (unskilled), information clerk (unskilled), and order clerk (unskilled). *Id.* For the position of a surveillance system monitor operator, there are 300,000 jobs in the national economy of which at least 3,000 are available in Pennsylvania; for information clerk, there are 200,000 jobs in the national economy of which 2,500 jobs are available in Pennsylvania; for the position of order clerk, there are 346,000 jobs in the national economy of which at least 4,200 jobs are available in Pennsylvania. *Id.* The ALJ concluded that, based on Plaintiff's age, level of education, work experience, and the residual functional capacity, Plaintiff was able, during the "initial period at issue" to perform jobs that existed in significant numbers in the national economy. R. 3, at 27. The Court, therefore, finds that the ALJ's determination as to Plaintiff's residual functional capacity is supported by substantial record evidence.

## IV.     Conclusion

It is undeniable that Plaintiff has a severe impairment and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. In light of the foregoing standards of review and the record, however, the Court must defer to the ALJ's findings of fact which are supported by substantial evidence on the record.

The Court has reviewed the ALJ's findings of fact and decision, and determines that his finding that plaintiff was not disabled under the Social Security Act is supported by substantial

evidence. Accordingly, the Court will grant the Commissioner's Motion for Summary Judgment, deny Plaintiff's, and enter judgment in favor of the Commissioner.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAULA NGUYEN,               )
                                            )
                   Plaintiff,      )      2:07-cv-751
     v.                                 )
                                            )
MICAHEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL SECURITY,     )
                                            )
                  Defendant.     )

**ORDER OF COURT**

AND NOW, this 2nd day of June, 2008, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

     1.     Plaintiff's Motion for Summary Judgment (Document No. 5) is **DENIED**.

     2.     Defendant's Motion for Summary Judgment (Document No. 6) is

           **GRANTED**; AND

     3.     The Clerk of Court is to docket this case closed forthwith.

                      BY THE COURT:

                      s/Terrence F. McVerry
                      United States District Court Judge

cc:     Robert W. Gillikin, II, Esquire
        Email: rgillikin@peircelaw.com

        Jessica Smolar, Esquire
        Email: jessica.smolar@usdoj.gov